GEORGE W. TAYLOR v. ST. LOUIS NATIONAL LIFE INSURANCE COMPANY, Appellant.

Division One, December 21, 1915.

1. INSURANCE COMPANY: Organization: Agent to Sell Stock. Under the statutes (Secs. 6895-6902, R. S. 1909) a charter of an insurance company cannot be adopted until its stock is subscribed, nor is there any corporation until the amount of the proposed stock has been subscribed. The persons designated as "corporators" in those statutes are only given power to open and keep open books to take subscriptions to the capital stock; they have no stock for sale, and are not authorized to sell stock upon the market or otherwise; nor do they have power, in behalf of the corporation, to enter into a contract with an agent to sell stock or proposed stock.

2. ————: ————: ————: Purpose of Statute. The statutes mean that the cash paid or secured notes given for the stock of an insurance company, at the time, of its organization, shall go into its corporate treasury, and shall not be depleted or diminished by percentages paid to an agent of the corporators for securing subscribers. And they apply in the same way to any surplus obtained from subscribers of the stock.

3. ————: Contract with Agent Prior to Organization. A contract made with the chairman of the "corporators" or organization committee of an insurance company, to pay an agent a certain commission on all subscriptions he obtains to the company's corporate stock, having been made before its organization, is not binding on the company, or enforceable against it.

4. ——: ——: **Notice of Limited Powers.** The "corporators" of an insurance company prior to its organization, are, under the statutes, agents of limited powers, and any one dealing with them must do so at his peril; and an agent, who enters into a contract with the chairman of the organization committee, who afterwards becomes its president, to obtain subscribers to its proposed capital stock, for a certain commission, is chargeable with notice that such chairman had no power to bind the corporation by such contract, for he is also chargeable with notice that under the statutes there can be no corporation until after the stock is subscribed, and that all the cash received from subscribers to stock must go into the company's treasury.

5. **AGENT: Failure to Sell Stock at Agreed Price.** Where plaintiff agreed to sell stock at $200 for each share of $100 par value, and for his services was to receive ten per cent of the amount he so sold, he cannot, in a suit on the contract, and not in *quantum meruit*, recover for stock sold at less than $200 a share. And an agreement by a trust company to put up, for incorporation purposes merely, an amount of money equal to $200 per share of the stock sold to it, with the understanding that one-half of it is to be returned to it after the company is duly incorporated, cannot be twisted into a sale at $200 per share.

6. ——: **Action on Specific Contract: Quantum Meruit.** Where plaintiff's pleadings are bottomed on a specific contract and the case is tried on that theory, a judgment cannot stand on *quantum meruit*.

Appeal from St. Louis City Circuit Court.—*Hon. Wilson A. Taylor*, Judge.

REVERSED.

*Collins, Barker & Britton, E. M. Harber* and *Albert L. Reeves* for appellant.

(1) Defendant's demurrer to the evidence at the close of plaintiff's case should have been sustained. (a) There was no evidence of Starnes's authority to bind the defendant. A principal is responsible for the act of an agent acting with apparent authority, only where the principal has clothed the agent with the appearance of power. Taylor v. Sartorious, 130 Mo. App. 34; Duffy v. Mallinkrodt, 81 Mo. App. 449. Starnes could not have bound the defendant by wrong-

fully assuming to act as its president.  Art. 2, chap. 61, R. S. 1909.  (b)  There was no evidence of Webb's authority to act as agent for the Missouri-Lincoln Trust Company in the purchase of the stock.  Taylor v. Sartorious, 130 Mo. App. 24; Lyons v. Corder, 253 Mo. 551.  (c)  There was no sale at $200 per share, in compliance with the terms of plaintiff's alleged contract with Starnes.  Young v. Cooperage Works, 259 Mo. 220.  (d)  Plaintiff was not the procuring cause of the sale actually made.  (2)  Defendant's peremptory instruction as the close of the whole case likewise should have been sustained.  (3)  While the appellate court will not disturb the verdict of the jury upon a question of the weight of evidence, it will not hesitate to do so where the verdict is not supported by the evidence.  Lyons v. Corder, 253 Mo. 561; Graney v. Railroad, 157 Mo. 678; Powell v. Railroad, 76 Mo. 84; McFarland v. Accident Assn., 124 Mo. 222; O'Donnell v. Railroad, 152 Mo. App. 614; Fitzjohn v. Transit Co., 183 Mo. 78; Knisely v. Leathe, 178 S. W. 461; College v. Dockery, 241 Mo. 522.  (4)  The judgment of the lower court should be reversed without remanding. Knisely v. Leathe, 178 S. W. 461; College v. Dockery, 241 Mo. 522.

*Marion C. Early* for respondent.

(1)  The petition alleged that defendant was a corporation duly organized, and this allegation not being denied under oath, it is admitted.  Under the pleadings and the evidence it was a corporation *de jure* at all times from and after the date of plaintiff's contract.  (2)  The defendant held itself out as a corporation; it allowed Starnes to advertise himself as its president; it allowed him to act for it in the sale of a portion of its stock; it accepted the results of the contracts made by him and under the facts disclosed it is, as to third persons dealing with it in good faith, a corporation *de facto* in any event and it is liable to third

persons for its acts. Camp v. Byrne, 41 Mo. 525; Knapp v. Joy, 9 Mo. App. 575; Brown v. Scottish American Mortg. Co., 110 Ill. 235; Montgomery v. Hurst, 9 Ala. 513; Douglas County v. Bolles, 94 U. S. 104; Bank v. Trust Co., 187 Mo. 494; Wescott v. Guarantee Ins. Co., 63 Mo. App. 366; Famous Ins. Co. v. Medles, 52 Mo. 17; National Ins. Co. v. Bowman, 60 Mo. 252; Ragan v. McElroy, 98 Mo. 349; Studebaker Bros. Mfg. Co. v. Montgomery, 74 Mo. 101. (3) It is well settled that when an officer of a corporation is allowed to exercise a particular authority publicly, in other words, if he is in effect held out to the world as having authority in the premises, the corporation is bound by his acts in the same manner as if the authority were expressly granted, in which case it is not necessary in order to charge the corporation to prove special authorization. Fayles v. Ins. Co., 49 Mo. 380; Slothard v. Aull, 7 Mo. 318; Lungstrass v. Ins. Co., 57 Mo. 107; Ceeder v. Lumber Co., 86 Mich. 541; Ferry Co. v. Sidell, 66 Fed. 27, 13 C. C. A. 308; Thompson on Corp., secs. 4876-4882; Chenoweth v. Express Co., 93 Mo. App. 199; Moon v. Mfg. Co., 113 Mo. 98; Rosenbaum v. Gilliam, 101 Mo. App. 126; Tyler Estate v. Hoffman, 146 Mo. App. 522. (4) Even if Starnes had no authority to enter into a contract with plaintiff the defendant is estopped to deny its liability because it acquiesced in Starnes's act by accepting and retaining the fruits thereof. Ferguson v. Trans. Co., 79 Mo. App. 352; Glass v. Brewing Co., 47 Mo. App. 641; Drug Co. v. Robinson, 81 Mo. 26; Railroad v. Vamedoe, 81 Ga. 175. (5) The defendant recognized the authority of Starnes to bind it by the contract with plaintiff by part payment to plaintiff for services rendered under the contract. The evidence shows defendant's contract to pay plaintiff a stated sum was the usual amount it was paying for such services. Fayles v. Insurance Co., 49 Mo. 380; Stohard v. Aull, 7 Mo.

318; Bank v. Bank, 107 Mo. 145. (6) The fact that defendant on its own motion may have made a contract whereby in the end it may have received a less consideration than it authorized plaintiff to offer, does not deprive plaintiff of his right to a commission on the amount realized. If in the opinion of the court the verdict is excessive the court is empowered to order a *remittitur.* Nichols v. Whitacre, 112 Mo. App. 692; Grether v. McCommack, 79 Mo. App. 325; Glade v. Mining Co., 129 Mo. App. 455; Smith v. Salt Co., 177 S. W. 1057.

GRAVES, P. J.—This is an action to recover commission for the sale of stock of the Universal Insurance Company, later by authorized change of name the present defendant, St. Louis National Life Insurance Company. Plaintiff sues upon an express contract to sell such stock at $200 per share of $100 par value, and to receive for such service the sum of ten per cent of the amount of stock so sold. He then avers he was the procuring cause of the said defendant having sold $75,000, in par value, or 750 shares, at the price and sum of $200 per share, and asks judgment for $15,000 and interest, less a payment of $200 which he avers to have been made.

The action is one clearly upon contract and not upon *quantum meruit.*

By the petition it would seem that there had been a settlement with plaintiff for $200, but this he avers to have been procured and induced by fraudulent statements, and it is for this $200 that he gives credit on the claimed commission of $15,000.

The answer was a general denial. From a verdict and judgment of $19,405.50, the defendant has appealed. Further facts will be stated in the course of the opinion under the points involved.

I. The first point urged by the defendant, is that the plaintiff had no valid contract with the defendant, and in as much as his own proof shows such fact, the demurrer to the testimony interposed by the defendant should have been sustained.

**Organization of Insurance Company: Contract with Agent.**

It is clear from all the evidence in this case that the organization of the Universal Life Insurance Company was not completed at the time plaintiff says that he contracted with it through P. M. Starnes. It could not have been completed until after the stock had been fully subscribed. It was not fully subscribed at the time of plaintiff's alleged employment. He testifies that he was introduced to P. M. Starnes as the president of the company, and that the sign at the office door was, ''Universal Life Insurance Company; P. M. Starnes, President.'' In this discussion we are granting it to be true that P. M. Starnes actually made the contract with plaintiff, as such contract is pleaded in his petition. Under all the evidence it was made with Starnes, or not at all. Defendant's testimony is to the effect that Starnes, prior to the subscription for all the stock, was merely a member of the organizing committee. The evidence is undisputed that at the time of the alleged employment of plaintiff to get subscribers to stock, only one-half of the proposed capital stock of the corporation had been subscribed. The proposed capital stock was 1500 shares of the par value of $100 each, but subscribers were taken on the basis of $200 per share, so as to create a surplus equal to the capital stock. Plaintiff's claim is that he induced the Missouri-Lincoln Trust Company and Mr. Webb to take the last half of the 1500 shares, or 750 shares at $200 each. This is the basis of his action. It shows upon its face that the insurance company was not then organized, because it could not have been organized. It shows upon its face that Starnes was not president,

because he could not have been president at that time, i. e., prior to the completed organization. The records are plain in this case, and even the way-farer cannot go far astray. On July 10, 1907, the following records appear:

11:30 a. m.          July 10, 1907.

The committee met in full at 11:30 a. m. Messrs. Blanke, Rassfeld, Goerts and James present, and called to order by Chairman Blanke.

Proposition was presented by Rassfeld and read by him from Barten in Litchfield, Ill., for completion of organization. On motion by Rassfeld and seconded by Blanke, this proposition was rejected.

Proposition submitted by the Mississippi Valley Life Ins. organization committee was on motion tabled for future consideration.

Proposition from P. M. Starnes not being completed, on motion committee adjourned to meet at 5:30 p. m. July 10, 1907.

OTTO H. RASSFELD, SECY.

5:30 p. m.          July 10, 1907.

Committee meeting called to order, Messrs. Blanke, Rassfeld, James and Goerts being present, by Chairman Blanke.

Proposition of P. M. Starnes submitted and read by Rassfeld. After careful and thorough consideration and investigation, on motion by Rassfeld, seconded by James, the committee voted to accept same.

On motion of James, seconded by Blanke, P. M. Starnes was elected a member of the committee, and chosen as chairman.

On motion, committee adjourned to meet at call.

OTTO H. RASSFELD, SECY.

These entries show that Starnes first became connected with the organization committee, not the corporation, on July 10, 1907.

On July 20th, after the stock deal with the Missouri-Lincoln Trust Company, the "first meeting of incorporators of the Universal Life Insurance Company" was had. At this meeting the first board of directors was selected, and the organization committee was directed to report expenses of the organization.

266Mo.19

On the same day Mr. Lewis was made chairman of the board of directors, and P. M. Starnes, president of the company, and J. A. Webb, secretary and treasurer of the company. It therefore stands out in bold faced type that Starnes was not and could not have been president of the defendant at the time of the alleged contract with plaintiff.

At most he was, in fact, but the chairman of the organization committee. Now on these facts we must apply the law.

That the organization of the Universal Life Insurance Company (the first name of the defendant, and it might not be amiss to say that it is now the Pioneer Life Insurance Company of Kansas City) was not completed at the date of the alleged contract with plaintiff, is made clear by the statute. Defendant was to be organized as a joint stock company, under and by authority of what is now article 2, chapter 61, Revised Statutes 1909.

Section 6898 of this article reads: "The persons mentioned in section 6895 shall be designated as corporators, and such corporators, desiring to form a company for the purpose of transacting the business mentioned in said section 6895, or any part of the same, shall file in the office of the superintendent of the insurance department a declaration signed by each of said corporators, setting forth the place of residence of each of them, and their intention to form a corporation for the purpose of transacting the business aforesaid, which declaration shall comprise a copy of the charter proposed to be adopted by them; and they shall publish once in each week, or oftener, for at least four weeks, in a newspaper of general circulation, published in the county where such corporation is proposed to be located, a notice of the filing of such declaration, together with a copy of the same."

Note the language as to the charter. This section simply says that this preliminary declaration shall contain "a copy of the charter *proposed to be adopted* by them." Then follows section 6899, which provides what this *proposed*, not adopted, charter shall contain.

Following this is section 6900, some parts of which we have italicized: "Whenever the corporators shall have filed the declaration required by section 6898, and also proof of the publication therein required, by the affidavit of the publisher of the newspaper in which the publication was made, his foreman or clerk, with the superintendent of the insurance department, it shall be the duty of said superintendent to submit such declaration to the Attorney-General of this State for examination, and if it shall be found by him to be in accordance with the provisions of this article, and not inconsistent with the Constitution and laws of this State and the United States, he shall so certify and deliver it back to the superintendent, who shall cause the said declaration and affidavit, with the certificate of the Attorney-General, to be recorded in a book kept for that purpose, and shall furnish a certified copy of the same to the corporators, and shall also file a certified copy of the same with the Secretary of State, who, upon payment into the State Treasury of the tax required by section 2976, shall issue a certificate of incorporation, upon the receipt of which they shall be a body politic and corporate, *and may proceed to organize in the manner set forth in their charter, and to open books for subscription to the capital stock of the company, and keep the same open until the whole amount specified in the charter is subscribed, but it shall not be lawful for such company to issue policies or transact any business of any kind or nature whatsoever, except as aforesaid, until they have fully complied* with the requirements of this article."

It must be seen that in the formative period the powers of the "corporators" are extremely limited.

Their only power is to open books for subscription to the capital stock, and keep them open until the proposed charter amount has been subscribed. Then we have setcions 6901 and 6902, which read:

"Sec. 6901. Upon being notified that the capital stock named in the charter has been subscribed, and one hundred thousand dollars thereof paid in, the superintendent shall make an examination, or cause to be made by some disinterested person specially appointed by him for that purpose, and if it shall be found by himself, or if the person so appointed shall certify, under oath, that the provisions of section 6920 have been complied with by said company, as far as applicable thereto, which certificate, when made, shall set forth the particulars of such compliance, then the superintendent shall so certify, and the corporators or officers of such company shall be required to certify, under oath, to the person making such examination, that the money, notes, stocks, bonds, mortgages and deeds of trust exhibited to him are the bona-fide property of said company."

"Sec. 6902. When the corporators have fully complied with the requirements of the preceding sections, and the laws of this State governing the organization of private corporations, and said corporation has deposited with the superintendent of the insurance department the amount of capital required to be deposited by section 6922, and shall have filed with the superintendent a certified copy of the certificate of incorporation issued by the Secretary of State, it shall be his duty to furnish the company a certificate of such deposit, and his certificate of authority for it to commence the business proposed in its charter which, with the certified copies of the aforesaid declaration and certificates, on being filed and recorded in the office of the recorder of the county in which the company is to be located, shall be its authority to commence business

and issue policies; and such certified copies of the declaration certificates and certificate of deposit may be used in evidence for or against said company, with the same effect as the originals.''

The statute does not in terms say when the ''proposed charter'' shall in fact be agreed to, and adopted, but it could not be adopted until the stock was subscribed. The original stock holders are the parties, who can agree to and adopt articles of association or charters. By the terms of the statute the ''corporators'' as designated in the several sections are only given power to open and keep open books to take subscriptions to the capital stock. They have no stock for sale, and are not authorized to sell stock upon the market or otherwise. They only have proposed stock to be subscribed for by those desiring to become stockholders in the proposed corporation. Under these statutes there is no corporation until the amount of the proposed stock has been subscribed. It is then, and not until then, that there can be a meeting of stockholders to select a board of directors, or to adopt the proposed charter or articles of association. The record before us would indicate that the parties organizing this defendant took this course. All the proceedings seem to appear in the name of the organization committee, until the time came when, as they thought, all the proposed charter capital had been subscribed, whereupon they all met, adopted the proposed charter, selected the board of directors, and such board in turn selected the officers, which we have named. This, however, was all done subsequent to the alleged employment of plaintiff. At the time of plaintiff's employment, neither Starnes, nor his committee, had any stock to sell. Neither Starnes nor his committee had any statutory power to do more than to open and keep open the subscription book. The power granted the original ''corporators'' by these statutes is not to sell

stock at any agreed price, but to take subscriptions to stock in a proposed corporation, which may or may not reach the point of a corporation. The power to open subscription books and receive subscriptions (and this is the only power conferred by statute) is not broad enough to authorize them to hire an agent to sell stock, for they had none to sell.

To my mind there is a clear purpose in these statutes. That purpose is to have in the hands of the corporation at its final organization the proceeds of the stock subscribed for, whether those proceeds be the cash required to be paid in on such subscriptions, or the secured notes given for the other portion of such subscription. Their purpose is to frustrate a small coterie of corporators from standing to themselves, in an inner ring, as it were, and absorbing a portion of the assets of the proposed corporation at or before the time of its final incorporation. They were designed to have in the treasury at the organization the capital spoken of in the charter.

But whatever the legislative purpose in expressly limiting the power of the original "corporators" as they are designated in the law, the courts can only take the laws as they find them. These laws are not broad enough to authorize the original "corporators" to hire agents to sell stock or proposed stock. We might as well meet the issue squarely, and we do so meet it. Power to open books and take subscriptions to proposed stock, means that the subscriber, and each of them, subscribe for and pay for their stock under the terms of the statute, and that the cash paid or the secured notes given, shall go into the corporate treasury, and it does not mean that the corporators themselves or through hired agents, can obviate this purpose. If they possess the power of giving an agent ten per cent to secure subscribers, if difficulties in getting subscribers required it, more might be given. Nor

does the fact that they agree upon a surplus change the situation. The surplus, if agreed upon as a charter measure, is as much of a trust fund as is the original capital.

We shall not go further in argument. It is sufficient for us to say that the statute has given these corporators no power to employ and pay agents to dispose of stock or proposed stock, and absent this power the alleged contract with plaintiff must fall.

No doctrine of law is better settled than that which says that one who deals with an agent of limited power must deal with him at his peril. These "corporators" were agents with limited power under the statute. The plaintiff in this case knew when he was dealing with Starnes that the corporation stock had not been subscribed. It may be a violent presumption, but it is one nevertheless, that each citizen is presumed to know the law and must make his acts accord therewith. Knowing that the stock had not been subscribed, as plaintiff admits, he, under the law, knew that Starnes could not be acting otherwise than a mere corporator. He knew that as to the proposed corporation these corporators were mere agents with limited power. He dealt with them therefore at his peril. If they or either of them, made the contract with him, his benefit under the contract must be measured by the power of these agents to make it. If they had no such power, as we hold, then he had no valid contract, and we so hold.

II. There is at least another question in this case that settles it adversely to the plaintiff. Plaintiff does not sue in *quantum meruit*. He sues upon a specific contract. That contract is that he was

**Suit on Contract.** engaged to sell stock or procure buyers for stock, or subscribers for stock at $200 for each share of $100 par value, and for services thus rendered, was to receive ten per cent of the amount he so sold. His pleadings are bottomed upon this theory.

His instructions *nisi* are upon this theory. Upon this theory (the theory upon which the court *nisi* proceeded throughout) his evidence totally failed. No fair reading of the evidence given will show that the plaintiff sold any stock to the Missouri-Lincoln Trust Company at $200 per share. The uncontradicted proof is that the sale (if it can be called a sale) was made at a price very much less than $200 per share.

It is true that when it was found that the corporation could not be completed, the Missouri-Lincoln Trust Company put up about $28,000 more than it had agreed to pay, for incorporation purposes merely, with the understanding that this was to be returned, after the corporation was duly incorporated. It had in the first instance only paid what it had agreed to take over the stock at, viz., $28,000 or more, less than $200 per share. This slight-of-hand performance for purposes of evading the corporation laws of this State cannot change the contract price. So that upon the theory upon which this case was pleaded and tried, there was a failure of proof, and the demurrer to the testimony should have been sustained.

The judgment *nisi* should be reversed and it is so ordered. All concur.